Jason Kerr
jasonkerr@ppktrial.com
Utah Bar No. 8222
*Local Counsel for Plaintiffs*
PRICE PARKISON & KERR, PLLC
5742 W. Harold Gatty Dr. Suite 101
Salt Lake City, UT 84116
(801) 530-2900

Jarod Bona
jarod.bona@bonalawpc.com
(Pro Hac Vice Application Pending)
Aaron Gott
aaron.gott@bonalawpc.com
(Pro Hac Vice Application Pending)
*Counsel for Plaintiffs*
BONA LAW PC
4275 Executive Square Suite 200
La Jolla, CA 92037
(858) 964-4589

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| ELIZABETH STRAND and AMARA ENTERPRISES, INC.,<br><br>                         Plaintiffs,<br><br>        vs.<br><br>USANA HEALTH SCIENCES, INC.,<br><br>                         Defendant. | Case No.:  2:17-cv-00925<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Mrs. Elizabeth Strand and Amara Enterprises, Inc. (collectively, "Strand") allege as follows upon actual knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

Strand seeks legal and equitable redress for her substantial and ongoing injuries. After Strand entered into a contract with USANA Health Sciences, Inc., and built a successful distributorship benefitting it, USANA fabricated a pretextual reason to wrongfully terminate Strand's contract.

USANA is a multi-level marketing company that sells nutritional products. It recruits associates, who (1) purchase products from USANA to sell and for their own consumption and (2) recruit "down-line associates" to sponsor. In 1995, Strand executed a distributor agreement as an independent contractor allowing her to promote and sell USANA products and recruit her own down-line associates. And over the course of 16 years, she built a very successful distributorship, generating annual revenues of $1 million for USANA and earning USANA's emerald director designation and the top-tier compensation plan that comes with it. Over the years, Strand's husband, Dr. Ray Strand—separately and independently from Strand or Amara—began a nonexclusive business relationship to promote USANA products as a nutrition spokesman. Dr. Strand, a well-respected and influential medical doctor author, speaker, and consultant, was paid a modest sum of $2,000 a year for his work with USANA, which coincided with other speaking engagements—including with USANA competitors—throughout his relationship with USANA.

USANA's founder eventually handed the reigns to his son, and bad decisions led to public accusations of fraud and corruption in 2007. This led to an eventual exodus of USANA executives, some of whom formed Ariix, LLC to compete with USANA—attracting USANA distributors in significant numbers. These issues undermined USANA's prospective financial position and ability to attract new independent distributors, and Ariix became the focus of animus at USANA.

In 2011, Dr. Strand agreed to speak on behalf of Ariix—as he was free to do: he had no exclusive agreement and had openly spoke for some of USANA's competitors in the past without any complaint. Nevertheless, USANA saw red and retaliated—not by cutting ties with Dr. Strand, but by doing something it felt would hit close to home: it took deliberate steps to manufacture a pretext to wrongfully terminate one of its most successful distributorships, Amara, ultimately wiping away Strand's 16 years of hard work, punishing her for her husband's independent career choices.

USANA apparently thought its drastic action would send a message and chill the mass exodus of its distributors to Ariix and, ultimately, stall the growth of a fierce competitor with whom it shared bad blood. Ultimately, Strand was the one who suffered: USANA converted Amara's stable customer base into its own, depriving it of self-sustaining revenues and refusing to pay the compensation that it was contractually obligated to pay.

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and more than $75,000 is in controversy. The Court has

personal jurisdiction over the Defendant because USANA's principal place of business is in Utah.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because USANA resides in this district. Moreover, the parties agreed to venue in this Court.

## PARTIES

3.      Plaintiff Elizabeth Strand is an individual domiciled in South Dakota and the sole registered owner of Amara Enterprises, Inc.

4.      Plaintiff Amara Enterprises, Inc. is a registered corporation in South Dakota, created for the purpose of distributing USANA nutrition products.

5.      Defendant USANA Health Sciences, Inc., or USANA, is a publicly traded, Utah-based multi-level marketing company that promotes and sells various nutritional products and dietary supplements.

## SUBSTANTIVE ALLEGATIONS

6.      USANA sells its products worldwide through a multi-level marketing system business model. This model utilizes vertically organized independent distributors, which it calls associates. USANA also sells directly to "preferred customers" who purchase USANA products for personal use. Unlike associates, preferred customers cannot resell products.

7.      To become an associate, one must complete an application under the sponsorship of an existing associate, thereby becoming part of the sponsoring associate's "down-line" sales organization. These new associates sign a written contract and agree to USANA's terms and conditions, policies and procedures, and compensation plan. They are further required to

purchase a starter kit, and are solicited by USANA to purchase additional training and marketing materials, which promise to help associates start and build their businesses.

8.      Each associate is an independent contractor and not a USANA employee, and therefore each associate has complete control to determine how to set up her business, sell USANA products, recruit new down-line associates, or otherwise run her USANA distributorship. USANA does not offer its associates any mandatory training and each associate is allowed freedom to develop her own unique business, restricted only by USANA's policies and procedures.

9.      To earn commissions or other associate incentives, USANA's policies and procedures require each associate to make additional "qualifying purchases" of USANA's products each month. The products received from these qualifying purchases must then either be resold to consumers or personally used by the associates. Therefore, to successfully earn commissions or other associate incentives—bonuses, retail markups, or awards from contests and promotions—an associate must either sell USANA products to customers or recruit and sponsor new down-line associates.

10.     The success of USANA's business model is wholly dependent upon new associate recruitment because product sales to its own associates comprise nearly all of USANA's revenue in any given year. In 2011, for example, net sales to its 45,000 associates in North America comprised 90% of all sales and revenues made that year. In fact, recruitment of new associates into USANA and product sales to those new associates are essential to USANA's business model. To increase its revenue, USANA must increase the number and/or the productivity of its associates.

4

11.     Because there is only a nominal demand for USANA's products outside its own associates, or in the general consumer retail market—USANA's business model is particularly sensitive to competitors' actions; particularly competitors like Quixtar, an affiliate of Amway, or Ariix, both which manufacture competing nutrition products, and also provide multi-level marketing ("MLM") opportunities with competing compensation plans.

12.     In fact, because associates are a disproportionate share of USANA's customer base, USANA must promote compensation plans that are competitive with the compensation plans of other similar MLM companies. Failure to do so results in USANA associates, particularly new associates, leaving USANA to begin working under a competitor's more rewarding compensation plan.

**Strand's Relationship with USANA**

13.     In 1995, Mrs. Strand, initially doing business as "Redeeming Health International," applied for and entered into a contract with USANA to become an associate. In 2000, Strand incorporated Amara and began operating the distributorship through that entity. Exhibit A.

14.     Throughout 1995 and over the course of the next 16 years, Strand was dedicated to and solely responsible for building her USANA distributorship business (hereinafter "Amara")—selling USANA products to customers and recruiting preferred customers and new associates—thereby creating a substantial down-line business network.

15.     At the height of Amara's development, Strand was running 14 business centers, in total generating over $1 million of commissionable business for USANA each year.

16.     In 1997, as a result of Strand's success, Amara qualified to become an emerald director within USANA's associate incentive program, which is the top tier of USANA's director program.

17.     As an emerald director, Amara became eligible for incentives and leadership bonus, which include the most exclusive, lucrative, and valuable incentives USANA offers in its compensation plan.

18.     Further, as a material part of the contract, Strand was capable of transferring its ownership interest and its executive ranks and benefits to her children. That is, Mrs. Strand had the right to continue the business that she had built in perpetuity and then pass it onto her children. Indeed, Mrs. Strand worked up to 60 hours a week while her three children were at home so that she could build the business up for her children's benefit later in life.

19.     From 1995 to 2011, Strand was always among the top 50 "earners" for USANA, and was usually always among the top 25 "enrollers" of new USANA preferred customers. USANA benefits immensely from her success, and not only financially: USANA featured Mrs. Strand in marketing materials to show prospective associates the potential for their business (a potential very few would ever reach), and even featured her on the front cover of USANA's magazine.

20.     Around the same time that Mrs. Strand began as a USANA associate, her husband, Dr. Ray Strand—separately and independently from Mrs. Strand or Amara—began a *nonexclusive* business relationship to consult with USANA as an independent nutrition expert. Dr. Strand, a well-respected and influential medical doctor author, speaker, and consultant, was paid a modest sum of $2,000 a year for his work with USANA, which coincided with other

speaking engagements—including with USANA competitors—throughout his relationship with USANA.

21.     In all of his activities, Dr. Strand postured himself as an independent nutrition expert; his mission in life is to spread his professional opinions about the importance of proper nutrition and nutrition supplementing.

**USANA's Market Problems—Competition**

22.     Beginning in 2007, USANA began facing a number of adverse market, business, and public challenges, not the least of which was an increased competitive environment created by the entrance of other nutritional MLM companies into the market.

23.     On February 21, 2007, USANA stock was trading at a high of $61.80. Less than a month later, on March 15, 2007, The Wall Street Journal published an article detailing improper business practices by USANA.

24.     The WSJ article, Securities and Exchange Commission filings, and other publicly available documents made clear that USANA's business model was unsustainable because:

   a.     the vast majority of the company's reported sales were made to distributors who were not end users of the products;

   b.     the company's long-term growth prospects were precarious because growth was almost entirely dependent upon recruitment, rather than upon an increase in retail demand for the company's products;

   c.     the overwhelming majority of USANA's distributors—who accounted for an overwhelming majority of the company's revenues—were *losing* money;

   d.     nearly three-quarters of distributors failed within the first year;

7

e.      the top 3% of all distributors were receiving more than two-thirds of all company-paid commissions;

f.      the company misrepresented the average income for distributors;

g.      USANA products were greatly overpriced; and

h.      the company's ability to attract new distributors would be materially and adversely affected if prospective distributors were aware of both the company's failure and collapse rates and associates' inability to resell overpriced products, as well as the fact that the top 3% of USANA associates receive most of the commissions.

25.     Immediately following publication of the WSJ article, shares of USANA's common stock fell over 15%. The SEC announced that it was commencing a formal investigation of USANA.

26.     A year later, in March 2008, USANA was faltering. USANA's disappointing financial results for the first quarter of 2008 were due to its difficulties in recruiting new associates. USANA projected that its difficulties in attracting associates would likely result in a 20% decrease in net sales and earnings growth for 2008. Securities analysts downgraded USANA stock and on March 28, its stock fell again by almost 21%.

27.     USANA lost approximately 18,000 associates between 2009 and 2011—from 63,000 associates in 2009, to 45,000 associates in 2011.

28.     As a result of the scandals, poor decisionmaking, and poor performance that plagued USANA, a number of key USANA executives and board members left USANA and started a new company: Ariix, LLC. Ariix, along with other new entrants in the market, became

fierce competition to USANA. While USANA looked for ways to rein in associate incentive payouts, Ariix and other competitors began offering a more attractive compensation plan as an alternative.

29.     In May 2011, Dr. Ray Strand, Mrs. Strand's husband and a well-respected doctor in the nutritional supplement community, entered into discussions to speak on behalf of and consult with Ariix.

30.     Because Dr. Strand's reputation was widely known and regarded, USANA greatly feared that his promotion of Ariix's products would do considerable damage to USANA's efforts to recruit and retain its associates, and further undermine its overall ability to out-compete Ariix.

### USANA Deliberately Targets Strand

31.     USANA's contract with Dr. Strand was nonexclusive: he was free to work for Ariix if he wanted. USANA could decide not to work with Dr. Strand in the future, but it knew that wouldn't be enough leverage. Instead, USANA knew that its only leverage was its unrelated contract with Amara.

32.     Dr. Strand spoke with Kevin Guest, USANA's President, late in June 2011. During the course of that discussion Mr. Guest threatened Dr. Strand, asserting a "household clause" in the Strand contract applies to him as a consequence of his marriage to Mrs. Strand. Guest claimed this "household clause" prohibited Dr. Strand from promoting USANA's competitors, particularly Ariix. If Dr. Strand promoted Ariix's products, he would be putting his wife's business in jeopardy.

33.     Amara's contract with USANA does not have a "household clause." Rather, USANA had a set of "policies and procedures" that had a clause stating that "[i]f any member of

an Associate's immediate household (an Associate's spouse or dependents) engages in any activity, which, if performed by the Associate, would violate any provision of the Associate Agreement, such activity will be deemed a violation by the Associate." The policy is silent on corporate associates like Amara.

34.     Also in these "policies and procedures" is an "unauthorized recruiting" provision that allows USANA associates to "participate in other direct selling or network marketing or multi-level marketing ventures, and Associates may engage in selling activities related to non-USANA products and services, if they desire to do so. However, Associates are prohibited from unauthorized recruiting activities . . . ." The provision is designed to keep USANA associates from cannibalizing their downstream associates by recruiting them to sell for USANA competitors.

35.     Even assuming the household clause applied in the case of a corporate associate like Amara, Dr. Strand did not "participate in other direct selling . . . ventures"; he speaks on behalf of nutrition companies about nutrition.

36.     Additionally, Mr. Guest's threats were contrary to USANA's course of dealing: throughout Amara's contract with USANA—or even during Dr. Strand's own contract with USANA—Dr. Strand openly promoted other nutritional products as a third-party expert, including those that competed with USANA. Indeed, USANA originally offered Dr. Strand a consultation agreement because it knew Dr. Strand engaged in public promotions on behalf of manufacturers of nutritional, personal care, and weight management products—some of which were direct competitors of USANA. These included Quixtar, the Yager Group, Nutrilite, and Nature's Way. USANA knew Dr. Strand was a publicly known and well-respected author and

commentator. He had published books, blogs, videos, and articles concerning health and nutritional supplements that other companies used to market their products—including two books titled *Healthy for Life* and *What Your Doctor Doesn't Know about Nutritional Medicine May Be Killing You*.

37.     But at no time from 1995 to May 2011 did USANA raise concerns related to Dr. Strand's relationships with USANA's competitors, or that any such relationship was in violation of any term of the Strand contract. Indeed, Dr. Strand's contract required USANA to explore additional avenues by which USANA could actively promote Dr. Strand as a leader in the field of nutritional medicine. His work for multiple companies showed both his expertise in nutritional medicine and his independence, which brought him broader name recognition and thus benefited USANA. So not only was Dr. Strand free to provide similar services for USANA's competitors, he was encouraged to do so by USANA. And not once—until Ariix—did USANA claim that either Dr. Strand or Amara was breaching a contractual obligation. In fact, USANA admitted as much when the Strands pressed USANA chief legal officer and general counsel James Bramble about these facts. According to Bramble, "Ariix is just too close."

38.     USANA consistently states in its 10-K Annual Report filed with the SEC, that— "We rely on non-employee, independent Associates to market and sell our products to generate our sales. Associates typically market and sell our products on a part-time basis ***and likely will engage in other business activities, some of which may compete with us***."

39.     Mrs. Strand has never violated this term of the Amara distributor agreement. Indeed, USANA's course of dealing shows that it did not view Dr. Strand's activities as violating the household clause and unauthorized recruiting clause throughout the years that Dr. Strand

carried on with similar activities for USANA competitors. Even if USANA did view those activities as violations—a view that would fatally conflict with the terms of the Dr. Strand contract described above—it failed to ever seek to enforce those policies and procedures and therefore waived them. USANA's threats to Mrs. Strand and Amara were baseless.

## USANA's Deliberate Acts to Wrongfully Terminate
## Strand Upon Its Improper and Manufactured Pre-Textual Cause

40.      Despite no legitimate basis to apply or enforce the household and unauthorized recruiting clauses against Amara, Bramble repeated and reiterated to Mrs. Strand on July 11, 2011 both that a "household clause" applies to Dr. Strand and that if he promoted Ariix's products, Strand would be subject to termination under USANA's policies and procedures.

41.      As USANA's top in-house attorney, Mr. Bramble was competent in the practice of law and knew that Dr. Strand's activities did not and could not form a basis to terminate Amara. Rather, understanding that Mrs. Strand would rely upon his statements, Mr. Bramble, on July 8, 2011 made such statements, for the deliberate purpose of misinforming Mrs. Strand of her contractual rights in the hope it would induce her to take action that *could* lead to an actual breach.

42.      Mrs. Strand made clear to Mr. Bramble at the July 8 meeting that she intended to sell Amara—as she is contractually entitled to do. Mrs. Strand did not want to sell the business, but Bramble had made clear that USANA was going to terminate Amara if Dr. Strand moved forward with Ariix. Mrs. Strand knew that if she sold, she would at least get *something* for all the hard work she put into it. She made inquiries concerning the time it would take to approve a buyer and complete the transfer and sale of Amara. Mr. Bramble knew Mrs. Strand sought to ensure the sale of Amara would be consummated prior in time to Dr. Strand's promotion of

Ariix's products—thereby ensuring USANA would not wrongfully and unilaterally terminate Strand, leaving her with nothing. Mrs. Strand knew she could only sell Amara was if she was in good standing.

43.     In response to Mrs. Strand's questions, Mr. Bramble stated that once Strand selected a buyer, USANA's approval and transfer process would take two weeks to complete. Mr. Bramble knew Mrs. Strand would rely upon the two-week time period he expressed at the July 8 meeting in coordinating the sale of Amara before her husband promoted Ariix's products.

44.     Relying on Mr. Bramble's statements, Mrs. Strand took immediate action to select a qualified buyer, one who she knew would run her business successfully. On July 12, 2011, Mrs. Strand, in full accordance with the instructions Mr. Bramble gave her, submitted the application for Amara's sale and transfer, expecting the sale would be complete no later than July 26, 2011.

45.     Despite USANA's representations to quickly act, it took no meaningful action to approve the prospective buyer. Rather, it took deliberate steps to delay and sabotage the transfer while it began taking steps to terminate Amara. USANA's inaction was motivated by the understanding that USANA would benefit most if it did not have to continue paying emerald director commissions and benefits to a new buyer.

46.     As a pretext to termination, USANA started an "investigation" while intentionally delaying the sale of Amara by imposing new processes contrary to USANA's policies and procedures, and then further requiring the prospective buyer to undergo an unprecedented three-week "mandatory training period" to learn USANA's policies and procedures.

47.     USANA extended the expected and promised transfer period from two to seven weeks and imposed significant, time-consuming new requirements that cost the buyer significant amounts of money neither Strand nor the buyer had expected. This undermined the buyer's confidence in USANA, which caused her to withdraw her offer to purchase Amara on August 6, 2011.

48.     Two days following the prospective buyer's withdrawal, on August 8, 2011, Mr. Bramble notified Strand that Ariix was advertising Dr. Strand's webinar with Ariix on August 9, 2011. Mr. Bramble threatened Mrs. Strand, stating that if Dr. Strand went forward with the webinar, such actions would constitute a breach of the Amara contract. Mr. Bramble knew Dr. Strand's action would not constitute a violation or breach of the Strand contract. Rather, Mr. Bramble's statement was made to deliberately intimidate and misinform Strand of its contractual rights.

49.     On August 9, 2011, Dr. Strand made a webinar with Ariix. Dr. Strand's actions in no way violated any provision of the Amara contract.

50.     Following Dr. Strand's webinar with Ariix on August 9, 2011, Mr. Bramble set out to deliberately intimidate Mrs. Strand, making statements which he knew were undoubtedly false—in particular, that USANA had justification to terminate the Amara contract.

51.     On September 8, 2011, Mr. Bramble sent a letter on behalf of USANA wrongfully terminating Strand, and citing Section 3.6 of USANA's policies and procedures. Section 3.6 of USANA's policies and procedures only forbids distributors from selling similar or competitive products to other USANA distributors and would not apply to the sorts of activities—giving speeches about nutrition—to Dr. Strand. Although by its terms the provision did not apply to Dr.

Strand, USANA claimed that Dr. Strand's webinar for Ariix *could* have been viewed by USANA distributors. Moreover, even if the provision did apply, USANA waived any right to enforce it by failing to do so over the course of 16 years during which Dr. Strand was engaged in exactly the same activities with other USANA competitors.

52.     USANA has a pattern, practice, and history of wrongfully terminating distributors for its own enrichment. In December 2008, for example, an arbitrator determined that USANA wrongfully terminated the distributorship of Praise Enterprises Ltd., a distributorship owned by Chris and Elizabeth Kutschera. In that case, USANA accused the Kutscheras of breaching their contract where no breach had occurred. Rather, it was USANA, acting in bad faith, who breached its agreement with the Kutscheras, causing damages of approximately $7 million and an arbitration judgment against USANA.

53.     Strand and Amara's damages are extensive. USANA did not merely wrongfully terminate the contract—it unjustly enriched itself by depriving Strand and Amara of a distributorship with which they had created a revenue stream that would have continued in perpetuity. As long as the distributorship remained, Amara's down-line distributors would continue to sell products and continue to recruit their own down-line distributors in a cycle that would continue indefinitely. Indeed, one of USANA's selling points was that anyone could set up a distributorship and, once it became successful, it would run itself.

### FIRST CLAIM
### Breach of Good Faith and Fair Dealing

54.     Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

55.     The distributor agreement, along with USANA's terms and conditions, policies and procedures, and compensation plan is a valid and enforceable written contract between Amara and USANA.

56.     The written contract manifests a clear common purpose whereby Amara, acting as an independent contractor and in accordance, the contract would be allowed to distribute USANA products and otherwise develop her distributorship business.

57.     Amara was justified in its reliance that USANA would act in good faith while executing the written contract and would take no action in bad faith to frustrate or otherwise diminish the clear purpose of the contract.

58.     Throughout 2011, USANA took numerous actions, described *supra*, including but not limited to, its manufacturing a pre-textual cause to terminate Amara, which were deliberately taken in bad faith and for no other purpose but to frustrate and undermine the common purpose each party agreed to promote under the contract.

59.     USANA's bad faith actions caused Amara substantial injury.

## SECOND CLAIM
### Breach of Written Contract—Wrongful Termination

60.     Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as if fully set forth at length herein.

61.     The distributor agreement, along with USANA's terms and conditions, policies and procedures, and compensation plan is a valid and enforceable written contract entered into between Amara and USANA.

62.     At all times, Amara fully and completely performed each and every term of the contract in good faith and in accordance with its obligations.

63.    As a material term of the contract, the parties agreed that the contract could only be terminated "for cause," or only if and after the contract's express terms were violated by Amara.

64.    Amara at all relevant times acted in good faith executing the contract and never violating any term with USANA.

65.    On September 8, 2011, USANA wrongfully terminated the written contract without cause. Even if the policies and procedures USANA sought to enforce were applicable, USANA waived its right to enforce them by failing to do so throughout the parties' relationship.

66.    The wrongful termination of the contract caused Amara to suffer substantial injury.

**THIRD CLAIM**
**Unjust Enrichment**

67.    Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as if fully set forth at length herein.

68.    While performing the contract and over the course of 16 years, Mrs. Strand created a business network of independent distributors, preferred customers, and retail customers through Amara that generated $1 million in revenue to USANA's benefit annually.

69.    USANA enjoyed the economic benefits and revenues that Amara's labor conferred upon it.

70.    USANA had appreciation and knowledge of the benefits Amara conferred upon it, evidenced by USANA designating Amara an emerald director for the revenues it generated for USANA.

17

71.     The creation of Amara's business network and the substantial economic benefits it conferred upon USANA would not have existed but for Mrs. Strand and Amara's efforts.

72.     USANA has taken egregious actions against Mrs. Strand and Amara, acting in bad faith, fraudulently, wrongfully terminating Strand in order to unjustly enrich itself to achieve a competitive edge and better financial position at the expense of harming Strand.

73.     In light of USANA's actions, it would be grossly inequitable to allow USANA to retain the benefit that was conferred upon it by Strand and Amara.

74.     Therefore, USANA should be made to provide sufficient value for the benefit Strand and Amara originally conferred, and which it now retains as a consequence of its unjust acts.

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs request that this Court:

    A.     Enter judgment against defendant;

    B.     Award Plaintiffs damages, including but not limited to actual damages, general damages, restitutionary damages, and punitive damages;

    C.     Award Plaintiffs equitable relief;

    D.     Award plaintiffs pre- and post-judgment interest at the applicable rates on all amounts awarded; and

    E.     Order any other such relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims.

DATED: August 15, 2017                    PRICE PARKINSON & KERR, PLLC

                                          /s/Jason Kerr
                                          JASON KERR (8222)

                                          5742 W. Harold Gatty Dr. Suite 101
                                          Salt Lake City, UT 84116
                                          (801) 530-2900
                                          jasonkerr@ppktrial.com

                                          *Local Counsel for Plaintiffs*

                                          Jarod Bona
                                          California Bar No. 234327
                                          (Pro Hac Vice Pending)
                                          Aaron Gott
                                          (Pro Hac Vice Pending)
                                          California Bar No. 314264
                                          BONA LAW PC
                                          4275 Executive Square, Suite 200
                                          La Jolla, CA 920370
                                          (858) 964-4589
                                          jarod.bona@bonalawpc.com
                                          aaron.gott@bonalawpc.com

                                          *Counsel for Plaintiffs*